UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTOINETTE JANE TYRER,

                    Plaintiff,          Civil Action No. 12-13711
                                         Honorable Gerald E. Rosen
                                         Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 16]**

      Plaintiff Antoinette Jane Tyrer ("Tyrer") brings this action pursuant to 42 U.S.C. §405(g),

challenging the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act (the "Act").  Both parties have filed summary

judgment motions [13, 16], which have been referred to this court for a Report and

Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

      For the reasons set forth below, the court finds that substantial evidence supports the

Administrative Law Judge's ("ALJ") conclusion that Tyrer is not disabled under the Act.

Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment

[16] be GRANTED, Tyrer's Motion for Summary Judgment [13] be DENIED, and that, pursuant

to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On March 9, 2009, Tyrer filed applications for DIB and SSI, alleging disability beginning on December 31, 1998.[1]  (Tr. 189-93).  Her claims were denied initially on June 12, 2009.  (Tr. 122-29).  Thereafter, Tyrer filed a timely request for an administrative hearing, portions of which were held on July 1, 2010, and September 15, 2010, before ALJ Paul Armstrong.  (Tr. 59-117). Tyrer (represented by attorney Philip Fabrizio) testified at both hearings, and vocational expert ("VE") Luann Castellana testified at the second hearing.  (*Id.*).  On October 27, 2010, the ALJ issued a written decision finding that Tyrer is not disabled.  (Tr. 13-24).  On July 3, 2012, the Appeals Council denied review.  (Tr. 1-3).  Tyrer filed for judicial review of the final decision on August 21, 2012.  (Doc. #1).

### B.    Background

#### 1.    Disability Reports

In a March 10, 2009 disability field office report, Tyrer reported that her alleged onset date was December 31, 1998.  (Tr. 220).  The claims examiner noted that, during a face-to-face interview, Tyrer had difficulty concentrating and talking.  (Tr. 222).  The claims examiner also noted that Tyrer's "hair looked disheveled, her face was sunked [sic] in, she was nervous and anxious during the entire interview … as far as answering questions, she looked lost and was not sure why she had to file for disability benefits, she has low memory and concentration skills, she kept saying I don't know a lot to my questions …."  (*Id.*).

In an undated disability report, Tyrer indicated that her ability to work is limited by manic depression, attention deficit hyperactivity disorder ("ADHD"), anxiety issues, and low

---

[1] There appears to be no dispute that, at the administrative hearing, Tyrer amended her alleged onset date to December 31, 2003.  (Doc. #13 at 9).

memory skills.[2]  (Tr. 225).  When describing how these conditions limit her ability to work, Tyrer stated, "I do not come out of the house for weeks due to depression and anxiety, I have body aches at times due to disability, I cannot work around people, I cannot follow oral directions to the end unless it is written down."  (*Id.*).  Tyrer reported that these conditions first interfered with her ability to work on December 31, 1998, and that she became unable to work on that date.[3]  (*Id.*).  Prior to stopping work, Tyrer worked in various positions for brief periods of time, including as a cocktail waitress, nail technician, and salon receptionist.  (Tr. 226).  Before that, she completed high school at an "alternative school for children with behavior problems," and she claims she attended special education classes.[4]  (Tr. 230).  She indicated that she received counseling for some unknown period of time through several organizations, including Catholic Social Services, Community Network Services, Oakland Family Services, and Woodward Counseling.  (Tr. 227-29).  At the time of the report, she was taking several medications, including Concerta, Deserall, and Wellbutrin.  (Tr. 229).

In a function report dated March 17, 2009,[5] Tyrer reported that she lived alone in a house that was in foreclosure.  (Tr. 243).  When asked to describe her daily activities, Tyrer said only: "Shower, coffee, dress, TV, eat, laundry, nap, smoke, clean, eat, sleep."  (*Id.*).  When asked what she could do before the onset of her condition that she is no longer able to do, Tyrer said,

---

[2] Importantly, as discussed below, after Tyrer filed applications for DIB and SSI in March of 2009 – and, apparently, after she completed both this disability report and her March 17, 2009 function report – Tyrer suffered a gunshot wound (in August of 2009) and was in a severe car accident (in January of 2010).

[3] Tyrer did have a couple of unsuccessful work attempts after this date.  Her last job involved a one-month position working as a concession stand attendant at a roller rink from June 2007 through July 2007, but she claims she had to stop working because of her disability.  (Tr. 215).

[4] Information provided by Tyrer's school district, however, indicates that it had no record of her receiving special education services.  (Tr. 267).

[5] Again, it bears mentioning that this function report was completed *before* Tyrer was shot and *before* she was involved in the automobile accident.

3

"Problem solve, decision making, interaction with people."  (Tr. 244).  Her conditions interfere with her ability to sleep, causing her to sleep "a lot more."  (*Id.*).  When asked how her conditions interfere with her personal care, Tyrer indicated that, when depressed, she neglects dressing, bathing, caring for her hair, shaving, and feeding herself.  (*Id.*).  However, she does not need reminders to care for herself or take medication.  (Tr. 245).  She is able to prepare her own meals and perform household chores, including cleaning, mowing the lawn, laundry, vacuuming, and doing the dishes.  (*Id.*).  When she is depressed, however, she does not perform any of these chores "for weeks."  (*Id.*).  She is able to count change, but she can no longer pay bills, handle a savings account, or use a checkbook because she gets confused, frustrated, and angry.  (Tr. 246-47).  Once a week, she goes shopping with family members.  (Tr. 247).  She needs reminders to go places, she does not go out alone, she does not drive, and she does not socialize unless she must.  (Tr. 246-48).  She has problems getting along with family, friends, and neighbors and gets angry and violent when there is a disagreement.  (Tr. 248).

When asked to identify functions impacted by her conditions, Tyrer checked: memory; completing tasks; concentration; understanding; following instructions; and getting along with others.  (*Id.*).  She can pay attention for only fifteen minutes, and she is unable to finish what she starts.  (*Id.*).  She can follow written instructions if they are "short," but spoken instructions need repeating.  (*Id.*).  She does not get along with authority figures and has been kicked out of school and incarcerated several times.  (Tr. 249).  She is "terrible" at handling stress and changes in routine.  (*Id.*).  She is "scared of people" and becomes defensive and nervous around them.  (*Id.*).

In a July 27, 2009 disability appeals report, Tyrer reported that there were no changes in her conditions since the date of her last report.  (Tr. 261-66).  The record also contains a follow-up disability appeals report, however, dated February 3, 2010, and completed by Tyrer's mother

4

when she was allegedly still in a coma following her car accident. In that report, Tyrer's mother indicated that Tyrer had been shot in August of 2009 and had been in a "horrible car accident" in January of 2010. (Tr. 270). As a result, she had a bullet lodged in her spine, had suffered "bad lung damage," and her entire right side (including her neck, spine, and lung) had been "crushed from shoulder to waist." (*Id.*). Tyrer could not talk, had undergone a tracheostomy, and was still on a ventilator. (*Id.*). She was taking numerous new medications, including ProAir, Spiriva, and Symbicort (for her lungs); and sertraline, lorazepam, and Pexeva (for anxiety and depression). (Tr. 272).

### 2. *Plaintiff's Testimony*

At the July 1, 2010 hearing before the ALJ, Tyrer testified that, in August of 2009, while standing in her kitchen, she was shot, and the bullet remains lodged between two of her ribs, near her spine. (Tr. 62-63). Her surgeon does not recommend surgery to remove the bullet because the surgery itself is painful and there is no guarantee that it will be successful. (Tr. 63). Tyrer further testified that the pain in her back is so bad that she cannot walk very far and, some days, cannot even get out of bed. (*Id.*). After listening to only a few minutes of testimony about Tyrer's physical condition, the ALJ, *sua sponte*, concluded that he needed to adjourn the hearing and send Tyrer for a physical evaluation because one had not been performed after she was shot and in the accident. (Tr. 67).

Tyrer's administrative hearing resumed on September 15, 2010,[6] at which time she again testified that she had been shot in August of 2009 when she was cooking in her kitchen, resulting in several fractures of her thoracic spine, and that the bullet was still lodged in her back. (Tr. 78,

---

[6] At the beginning of this hearing Tyrer's attorney said to the ALJ, "You're aware that she's already given her testimony once before on this case at the previous hearing that we had?" (Tr. 76). The ALJ responded, "Oh, yeah, yeah." (*Id.*).

81-83, 85).  Tyrer also testified that she was in a serious car accident in January of 2010, as a result of which she suffered a collapsed lung and broken bones in her spine, had a tracheostomy, and was in a coma for some period of time.[7]  (Tr. 78, 83-85, 97).  She still suffers from back and neck pain as a result of the accident – indeed, she was in a body cast for six weeks – and cannot walk very far.  (Tr. 78, 83, 85-86).  She is not supposed to stand for more than seven minutes at a time.  (Tr. 86).  In August of 2010, one of her treating physicians, Dr. Radden, attempted some type of "pain blocker" surgery (putting five wires in her back in an attempt to cauterize her nerves) to alleviate her back pain, but this procedure was unsuccessful.  (Tr. 79-80).

Tyrer testified that she has not worked in approximately three years, and her last job was working at a concession stand at a roller rink.  (Tr. 82-83).  She lives with her mother.  (Tr. 86-87).  She does not drive.  (Tr. 87).  She tries to help her mother around the house by folding laundry and helping with cooking, but she cannot vacuum or move clothes in and out of the washer or dryer.  (Tr. 88).  She cannot stand, lift, or bend.  (Tr. 89).  She takes Zoloft, Xanax, and MS Contin, which make her drowsy.  (Tr. 93).  She needs to lie down for thirty minutes two or three times a day to relieve her back pain.  (Tr. 93-94).  Tyrer further testified that, although she used to abuse drugs and alcohol, she had been clean for nine months.  (Tr. 64, 78-79).

---

[7] Tyrer testified at the hearing that she was in a coma for "[t]wo months and three weeks."  (Tr. 83).  Her medical records, however, reflect that she was somewhat responsive when she entered the hospital (*e.g.*, Tr. 379-380 (indicating that Tyrer was speaking and moving all extremities, but "uncooperative on the CT table," "continued to move all extremities…started to complain of pain in her back")), and that her total stay there lasted just over five weeks – from January 20, 2010, through February 25, 2010.  (Tr. 379-80, 383).  Tyrer's Glasgow Coma Scale ("GCS") scores also suggest that, at least on her initial admittance into the hospital, she was not in a coma.  (Tr. 379-80 (noting GCS scores of 10 and 13)).  *See Garcia v. Astrue*, 2012 WL 28273, at *7 fn. 29 (M.D. Pa. Jan. 5, 2012) (explaining GCS range of 3 (brain dead) to 15 (no impairment) and stating that a score of 7 is "usually accepted as a state of coma") (quoting *Mosby's Medical Dictionary*, 8th edition, 2009).  Thus, it is unclear how long Tyrer was actually in a coma.

3.      *Medical Evidence*

(a)      *Physical Impairments*

Although Tyrer's alleged onset date is December 31, 2003, the first real indication in the record that she suffers from a physical impairment consists of medical records from Pontiac Osteopathic Hospital ("POH") related to the August 2009 shooting incident which occurred about five months after she filed her applications for DIB and SSI.  On August 17, 2009, Tyrer was admitted to POH with a gunshot wound to the chest.  (Tr. 343, 390).  A CT scan revealed a bullet lodged in the soft tissue adjacent to the right transverse process between the tenth rib and the tenth thoracic vertebra.  (Tr. 391).  The scan also showed a diaphragm injury, a 4.6cm liver laceration, a bilateral pars defect at L5, and fractured seventh and tenth ribs.  (*Id.*).  Despite the fact that Tyrer reported on admission that she did not use illicit drugs, her urine drug screen was positive for opioids, cocaine, and benzodiazepines.  (Tr. 390-91).  Tyrer was hospitalized for ten days, during which time she underwent an open thoracotomy.  (Tr. 395).  On August 26, 2009, Tyrer was considered stable for discharge; however, she signed out against medical advice before she could be evaluated by the pulmonology group for postoperative care.  (*Id.*).

A few days later, on August 31, 2009, Tyrer was evaluated by Dr. Jeff Marshick, D.O., for complaints of chest pain, shortness of breath, sinus congestion, and audible wheezing.  (Tr. 347-49).  Dr. Marshick noted a history of suspected chronic obstructive pulmonary disease ("COPD").  (Tr. 347).  Tyrer was taking Symbicort, Spiriva, and ProAir, and admitted smoking up to two packs of cigarettes per day for 20 years (though she said she was down to ½ pack per day).  (Tr. 348).  On examination, Tyrer was in no acute cardiorespiratory distress, and the lungs revealed clear breath sounds bilaterally.  (*Id.*).  Pulmonary function studies were "essentially normal."  (*Id.*).  She was diagnosed with COPD and counseled to quit smoking.  (*Id.*).

7

The record reveals no further medical treatment until January of 2010, when Tyrer was an unrestrained passenger[8] in a severe car accident. She was ejected 40 feet from the vehicle and sustained multiple thoracic and lumbar spine fractures, including fractures to multiple ribs, several transverse processes of the thoracic spine, thoracic vertebrae T4-6 and T9, the right scapula, and the right clavicle. (Tr. 379-80). Again, her urine drug screen was positive for cocaine. (Tr. 379). A tracheostomy was performed a week after admission secondary to Tyrer's ventilator dependent respiratory failure. (Tr. 383). On February 25, 2010, when plans were being made for her to be placed at an extended care facility, Tyrer signed out against medical advice. (*Id.*).

On March 22, 2010, Tyrer presented to the emergency room at POH, complaining of low back pain stemming from her car accident and saying that she was not able to tolerate Vicodin. (Tr. 374). She had muscle spasms and limited range of motion in the thoracic and lumbar spine, and Norco was prescribed. (Tr. 375).

On June 14, 2010, Tyrer was evaluated by Louis Radden, D.O., of Spine Specialists of Michigan. Dr. Radden noted that Tyrer presented with complaints of constant pain in the mid-back, which began when she was involved in the January 2010 car accident. (Tr. 470). She described the pain as "sharp and stabbing," and said that it was better with lying down and worse with sitting and standing. (*Id.*). She also complained of leg weakness, tiredness, and radiation to the anterior aspect of the right chest. (*Id.*). On examination, Dr. Radden observed positive midline tenderness in the thoracic spine. (Tr. 471). Range of motion in the lumbar spine was preserved, and Tyrer could bend laterally with pain. (*Id.*). Her straight leg raising test was

---

[8] Tyrer maintained at the hearing that she was not driving the car. (Tr. 68). However, her attorney noted that, "she is pretty sure she wasn't [driving], but nobody knows how it happened," and Tyrer testified that she did not know who had been driving the car at the time of the accident. (*Id.*).

negative, and neurological examination revealed normal motor, sensory, and reflex findings. (*Id.*). Dr. Radden diagnosed Tyrer with strain/sprain throughout the spine, a pars defect at L5-S1, and lumbar spondylolisthesis at L5-S1.[9] (*Id.*). Dr. Radden also ordered an MRI of Tyrer's thoracic spine, which showed that she had remote fractures of T4-6 and T9, minimal disc bulging at T8-9 and T9-10 without canal or foraminal stenosis, and disc space narrowing at T4-5 through T6-7. (Tr. 464-65).

After reviewing the MRI results, Dr. Radden concluded that Tyrer's thoracic compression fractures appeared to be healed, but she continued to report intractable low back pain and chronic pain syndrome, particularly in the thoracic spine. (Tr. 468). In August of 2010, Dr. Radden inserted a trial spinal cord stimulator in Tyrer's spine, which produced significant relief on the left side, but exacerbated her symptoms on the right. (Tr. 462-63). Ultimately, Tyrer decided against permanent spinal cord stimulator placement. (Tr. 83).

On June 30, 2010, Dr. Marvin Bleiberg, of Michigan Spine & Pain, completed a medical source statement. (Tr. 444-45). In that statement, Dr. Bleiberg listed Tyrer's diagnoses as chronic pain due to trauma, thoracic pain, neck pain, cognitive deficits, brain injury, and numbness and tingling. (Tr. 444). He indicated that Tyrer was unable to sit or stand during a workday; could lift up to five pounds frequently; and could never bend, stoop, raise her arms above shoulder level, work around dangerous equipment, or tolerate dust, smoke, or fumes. (*Id.*). Somewhat inconsistently, Dr. Bleiberg indicated that Tyrer could stand for 15 minutes at a time and sit for 30 minutes at a time at home. (*Id.*).

After the first day of the administrative hearing, the ALJ sent Tyrer for a consultative examination with Dr. L. Patel, a physical medicine specialist. (Tr. 447-49). At the July 27, 2010

---

[9] An x-ray of the lumbar spine obtained on June 15, 2010, revealed unilateral spondylolysis at L5-S1 but no significant spondylolisthesis. (Tr. 473).

examination, Tyrer reported that she continued to experience "neck and back problems" resulting from her shooting and car accident.  (Tr. 447).  She had difficulty breathing and shortness of breath; she could walk 50 yards but was unable to turn, twist, lift, or bend over; and she could stand for only seven minutes.  (*Id.*).  However, she said that "sitting was okay."  (*Id.*).  On examination, Dr. Patel observed limited range of motion in the cervical spine and right shoulder.  (Tr. 450).  There was no evidence of tenderness or muscle spasm in any part of the spine, and her straight leg raising test was negative.  (Tr. 448).  Her grip strength was 3/5 on the right and 4/5 on the left.  (*Id.*).  Motor strength was 3-/5 in the right upper extremity but normal in all other extremities.  (*Id.*).  She was able to ambulate without a cane with a normal gait pattern; could heel walk, toe walk, and tandem walk; and was able to sit and stand.  (Tr. 449).  However, she was unable to bend, stoop, carry, push, or pull.  (*Id.*).

At the conclusion of his report, Dr. Patel stated:  "Based on today's examination, I feel that the claimant would be unable to work.  There is no limitation in walking.  There is limitation in carrying, pushing and pulling.  Grip strength is limited.  There is limitation in climbing stairs, climbing ropes, ladders or scaffolding."  (*Id.*).  On the same day, however, Dr. Patel completed a medical source statement, in which he opined that Tyrer could frequently lift and carry up to 10 pounds (up to 20 pounds occasionally).  (Tr. 454).  He further indicated that Tyrer could sit for up to six hours per day, and could stand and walk for up to two hours per day.[10]  (Tr. 455).  In light of these additional findings by Dr. Patel, the ALJ's supposition at the hearing, that Dr. Patel's concurrent statement that Tyrer was unable to work "might have been a typo or something," seems reasonable.  (Tr. 115).  At any rate, the additional findings by Dr. Patel certainly belie a conclusion that Tyrer could perform no work.

---

[10] Dr. Patel also identified limitations in overhead reaching; pushing and pulling; climbing of stairs, ramps, ladders, and scaffolds; and work at unprotected heights.  (Tr. 456-58).

*(b)     Mental Impairments*

Compared to her physical impairments – which appear to begin with the gunshot wound in August of 2009 – Tyrer's mental impairments have been more longstanding.  The record indicates that Tyrer received three months of substance abuse treatment in 2001 after a felony drunk driving conviction.  (Tr. 285-90).  Tyrer admitted that she was an alcoholic and had a history of four DUI charges.  (Tr. 285).  She was diagnosed with alcohol dependence and assigned a Global Assessment of Functioning ("GAF")[11] score of 55.  (*Id.*).  Between 2001 and 2009, however, there is no indication that Tyrer received any other mental health treatment.

On April 30, 2009, Tyrer submitted to a consultative psychological examination with Michael Matouk, M.A., L.L.P.  (Tr. 308-12).  She reported symptoms that included difficulty with concentration, organization, and ability to focus; mood swings; crying spells; fatigue and hypersomnia; loss of appetite; suicidal ideation; social isolation; and feelings of hopelessness and helplessness.  (Tr. 308).  Mr. Matouk noted that Tyrer socialized primarily with her friends and, occasionally, with her boyfriend or family.  (Tr. 309).  A mental status examination revealed full orientation, normal thought content, and slightly tense psychomotor activity.  (Tr. 310).  Tyrer's concentration was limited; she was able to perform serial threes, but could not perform reverse serial threes.  (*Id.*).  Her remote memory was assessed as poor, her abstract thinking was adequate, and she displayed poor judgment.  (Tr. 310-11).  In conclusion, Mr. Matouk stated that Tyrer displayed:

> …poor concentration abilities and memory functioning, including poor short-term and recent memory.  Ms. Tyrer displays sullen affect consistent with a depressed mood.  Her longstanding history of inattentiveness and hyperactivity suggest an AD/HD.  Her depression is likely contributing

---

[11]  GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

> significantly to her poor functioning.  She would likely be functional for employment with sustained treatment of her AD/HD, alcohol dependence, and depression.

(Tr. 311).  Mr. Matouk diagnosed Tyrer with major depressive disorder (recurrent, moderate) and ADHD, assigned her a GAF score of 48, and described her prognosis as "fair."  (Tr. 312).

On June 9, 2009, Ashok Kaul, M.D., reviewed Tyrer's then-available records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique.  (Tr. 314-16, 330-42).  Dr. Kaul noted that Tyrer suffers from ADHD (an organic mental disorder as defined in Listing 12.02), major depressive disorder (moderate) (an affective disorder as defined in Listing 12.04), and alcohol dependence (a substance addiction disorder as defined in Listing 12.09).  (Tr. 331, 333, 338).  Dr. Kaul opined that Tyrer is moderately limited in her activities of daily living, social functioning, and maintaining concentration, persistence, or pace, and has experienced no episodes of decompensation.[12]  (Tr. 340).  Dr. Kaul concluded that, from a psychiatric viewpoint, Tyrer is able to understand, remember and carry out simple instructions and, thus, is "capable of simple repetitive tasks." (Tr. 316).

During 2009 and 2010, Tyrer received psychiatric treatment and counseling through

---

[12] Specifically, in his RFC Assessment, Dr. Kaul opined that Tyrer is not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  (Tr. 314-15).  Dr. Kaul further opined that Tyrer is moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday or workweek without interruptions from psychological symptoms; interact appropriately with the general public; maintain socially appropriate behavior; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (*Id.*).

12

Community Network Services.  On February 18, 2009, Tyrer was evaluated by psychiatrist Dr. Marieta Bautista.  (Tr. 300-01).  Tyrer reported that her father had just died, and that she was having trouble concentrating.  (Tr. 300).  She was diagnosed with ADHD and major depressive disorder (recurrent, moderate), and was prescribed Wellbutrin, trazodone, and Concerta.  (Tr. 301).  Tyrer saw Dr. Bautista again on April 7, 2009, when she reported that she was crying and sleeping a lot.  (Tr. 421).  Dr. Bautista noted that Tyrer was "quite restless, very irritable, quite demanding and sarcastic during the interview."  (Tr. 422).  The results of her mental status examination were largely normal, however:  her speech was normal, her memory and fund of information were intact, and she was able to perform simple calculations.  (*Id.*).  Dr. Bautista diagnosed Tyrer with alcohol dependence, bipolar affective disorder, and post-traumatic stress disorder; assessed her GAF score as 55; and prescribed Pexeva and Seroquel.  (Tr. 423).  At follow-up visits during late 2009 and early 2010, Tyrer's clinical status was characterized as "stable" or "improving."  (Tr. 430, 433, 435, 437).  In June of 2010, Tyrer reported panic attacks stemming from her living situation and her upcoming Social Security disability hearing.  (Tr. 425).  By September of 2010, however, Tyrer reported that her living situation had changed for the better, and her medications were working.  (Tr. 481).

Based on these treatment records, Dr. Lisa Hinchman of Community Network Services completed a medical source statement on June 25, 2010.  (Tr. 416-20).  She assessed Tyrer's current GAF score as 55 and opined that Tyrer is mildly limited in activities of daily living and social functioning.  (Tr. 416-17).  She also indicated that Tyrer has marked limitations in her ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychological symptoms; and interact appropriately with the general public.  (Tr. 419).  She further opined that Tyrer is

13

moderately limited in several other categories, including the ability to understand and remember both simple and detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them.  (Tr. 418-19).

4.     *Vocational Expert's Testimony*

Luann Castellana testified as an independent vocational expert ("VE").  (Tr. 82-88).  The VE characterized Tyrer's past relevant work as ranging from unskilled to semi-skilled in nature, and light or sedentary exertion.  (Tr. 92).  The ALJ asked the VE to imagine a claimant of Tyrer's age, education, and work experience, who was able to perform sedentary work, with the following limitations:  (1) simple, unskilled work only; (2) the option to sit/stand at will; (3) no climbing of ropes, ladders, or scaffolds; (4) no work at unprotected heights or around dangerous moving machinery, open flames, or bodies of water; and (5) no concentrated exposure to noxious fumes, odors, respiratory irritants, or extremes of temperature or humidity.  (Tr. 92-93).  The VE testified that the hypothetical individual would not be capable of performing Tyrer's past relevant work.  (*Id.*).  However, the VE testified that the individual would be capable of working in the position of sorter/inspector (1,000 jobs in southeast Michigan), assembler (2,000 jobs), packager (1,000 jobs), or surveillance system monitor.  (Tr. 92-93, 112).  The VE further testified that if the hypothetical individual was unable to concentrate/stay on task for an average of fifteen minutes out of every hour, or if she needed to lie down during the day because of pain, she would not be able to maintain full-time competitive employment.  (Tr. 93-95).

**C.     Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

14

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Secy' of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

15

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Tyrer is not disabled under the Act.  At Step One, the ALJ found that Tyrer has not engaged in substantial gainful activity since her alleged onset date.  (Tr. 15).  At Step Two, the ALJ found that Tyrer has the severe impairments of residual effects of gunshot wound and motor vehicle accident, including thoracic vertebral and rib fractures; chronic pulmonary disease; ADHD; major depressive disorder; and polysubstance abuse.  (*Id.*).  At Step Three, the ALJ found that Tyrer's physical impairments do not meet or medically equal a listed impairment.  (Tr. 16).  The ALJ also concluded that Tyrer's mental impairments, whether considered alone or in combination, do not meet or medically equal Listing 12.02 (organic mental disorders), Listing 12.04 (affective disorders), or Listing 12.09 (substance addiction disorders).  (Tr. 16-17).

The ALJ then assessed Tyrer's residual functional capacity ("RFC"), concluding that she is capable of performing sedentary work, with the following limitations:  (1) simple, unskilled work only; (2) the option to sit/stand at will; (3) no climbing of ropes, ladders, or scaffolds; (4) no work at unprotected heights or around dangerous moving machinery, open flames, or bodies of water; and (5) no concentrated exposure to noxious fumes, odors, respiratory irritants, or extremes of temperature or humidity.  (Tr. 17-23).

At Step Four, the ALJ determined that Tyrer is unable to perform her past relevant work as a waitress, server, or receptionist.  (Tr. 23).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Tyrer is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 23-24).  As a result, the ALJ concluded that Tyrer is not disabled under the Act.  (Tr. 24).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human*

17

*Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ

or this court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r*

*of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence

without directly addressing in his written decision every piece of evidence submitted by a

party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial

evidence, "it must be affirmed even if the reviewing court would decide the matter differently

and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of*

*Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

    **F.**    **Analysis**

Although Tyrer's motion for summary judgment is not particularly cogent, it appears she

is making three arguments before this court:  that the ALJ erred in (1) failing to provide her with

a fair hearing; (2) failing to properly weigh various medical opinions; and (3) concluding that she

was not entirely credible.  Each of these arguments will be discussed in turn.

    *1.*    *The ALJ Provided Tyrer with a Fair Hearing and Reasonably Asked*
        *Questions Regarding Her Alleged Symptoms and Impairments*

As discussed above, the ALJ held two separate administrative hearings in this matter –

the first in July of 2010, and the second in September of 2010.  (Tr. 59-73, Tr. 74-117).  At the

conclusion of the first hearing, which was not particularly substantive and lasted only twenty

minutes, the ALJ requested that Tyrer undergo a physical evaluation because the record did not

contain evidence supporting her allegations of a disabling physical impairment.  (Tr. 67).  The

ALJ also requested that Tyrer present evidence that she was no longer abusing drugs or alcohol.

(*Id.*).  When the second hearing began, the ALJ acknowledged that Tyrer had already given some

testimony during the prior hearing.  (Tr. 76).  He then proceeded to ask Tyrer some basic

questions about her symptoms and underlying medical conditions, including whether she was

left-handed or right-handed and whether her back hurt.  (Tr. 77-78).  Tyrer argues that the ALJ's questions demonstrate that he was unfamiliar with the medical records and her allegations and that, as a result, she was denied a fair hearing.  (Doc. #13 at 13-14).

The court finds no reason to draw any negative inference from the ALJ's handling of Tyrer's hearing.  First, the court notes that the ALJ was sufficiently cognizant of the dearth of medical evidence related to Tyrer's alleged physical impairments at the first hearing that he *sua sponte* requested she undergo a physical evaluation before continuing the hearing.  Second, when Tyrer came before him again, it was entirely appropriate for the ALJ to question her as he did. As the Commissioner persuasively argues, the applicable regulations permit the ALJ to question a claimant about her condition.  *See* 20 C.F.R. §404.944.  The ALJ complied with this regulation by inquiring into the nature and extent of Tyrer's alleged symptoms, and he properly allowed Tyrer to identify and describe her impairments and explain why she believes she is unable to work.  The fact that, near the beginning of the second hearing (which was held more than two months after the first hearing), the ALJ asked Tyrer what was "wrong with [her] back" (Tr. 78) does not demonstrate (or even imply) that he ignored the medical record or denied Tyrer a full and fair hearing.  Moreover, a review of the ALJ's decision, which is quite detailed and thorough in its discussion of both the medical evidence and Tyrer's hearing testimony (Tr. 16-23), makes clear that Tyrer was given a full and fair opportunity to present both documentary and testimonial evidence pertaining to her impairments, and that the ALJ thoroughly considered the record in making his decision.[13]  Accordingly, there is no merit to Tyrer's argument that the ALJ

---

[13] Tyrer also asserts that the ALJ's failure to mention in his decision certain facts, medical records, and aspects of her testimony provides further support for her argument that she was denied a fair hearing.  Specifically, Tyrer takes issue with the fact that the ALJ's decision "never mentions the fact that there were two separate hearings," "does not mention that [Tyrer] was in a coma (and on a vent) just nine months before the 2nd hearing," "fails to make any note of [the

19

denied her a fair hearing.

> 2.    *The ALJ's Consideration of the Medical*
> *Opinions is Supported by Substantial Evidence*

The bulk of Tyrer's summary judgment papers are devoted to her argument that the ALJ erred in failing to properly weigh various medical opinions – specifically, those of Dr. Patel, Dr. Bleiberg, Dr. Kaul, Mr. Matouk, and Dr. Hinchman.  (Doc. #13 at 16-23).  A review of the record, however, indicates that the ALJ's evaluations of these opinions, and his subsequent conclusions, are supported by substantial evidence.

> a.    *Tyrer's Physical Impairments*

> (1)    *Dr. Patel's Findings and Opinion*

After the first day of the administrative hearing, the ALJ sent Tyrer for a consultative examination with Dr. Patel, a physical medicine specialist.  (Tr. 447-49).  On examination, there was no evidence of tenderness or muscle spasm in any part of Tyrer's spine, and her straight leg raising test was negative.  (Tr. 448).  Her grip strength was 3/5 on the right and 4/5 on the left. (*Id.*).  Motor strength was 3-/5 in the right upper extremity but normal in all other extremities. (*Id.*).  She was able to ambulate without a cane with a normal gait pattern; could heel walk, toe walk, and tandem walk; and was able to sit and stand.  (Tr. 449).  However, she was unable to bend, stoop, carry, push, or pull.  (*Id.*).

Despite these relatively normal clinical findings, Dr. Patel inconsistently concluded his

---

February 2010] Function Report," and fails to mention results of a February 2010 CT scan. (Doc. #13 at 5, 6, 11, 13).  There is no requirement, however, that the ALJ discuss every piece of evidence in the administrative record.  *See Kornecky*, 167 F. App'x at 508 ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  Moreover, Tyrer fails to explain how these alleged omissions by the ALJ prejudiced her, and the court sees no such prejudice here.  In short, the ALJ's failure to mention these specific "facts" does not mean Tyrer was denied a fair hearing, particularly where – as here – the ALJ's decision was both thorough and well-reasoned in its consideration of the record evidence as a whole.

report by saying, "Based on today's examination, I feel that the claimant would be unable to work. There is no limitation in walking. There is limitation in carrying, pushing and pulling. Grip strength is limited. There is limitation in climbing stairs, climbing ropes, ladders or scaffolding." (*Id.*). At the administrative hearing, the ALJ addressed this discrepancy, noting that Dr. Patel's clinical findings reflected that Tyrer could perform sedentary work, and voiced his suspicion that Dr. Patel's statement that Tyrer was unable to work "might have been a typo or something …." (Tr. 90, 115). Accordingly, the ALJ credited the clinical findings from Dr. Patel's report, but did not credit his statement that Tyrer was unable to work. (Tr. 20).

Tyrer asserts that the ALJ erred in failing "to make <u>any mention whatsoever</u> of Dr. Patel's conclusion that 'I feel that the claimant would be unable to work.'" (Doc. #17 at 4) (emphasis in original) (citing Tr. 449). In her response brief, the Commissioner concedes that "the ALJ did not explain his rejection of Dr. Patel's opinion," but argues that this omission was harmless error because this aspect of Dr. Patel's opinion is "patently deficient."[14] (Doc. #16 at 17-18). Indeed, courts have recognized that where a treating physician's opinion is patently deficient, it is reasonable for an ALJ to reject it altogether. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) ("For instance, if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to [provide good reasons

---

[14] The Commissioner also argues that the ALJ was not required to credit Dr. Patel's opinion that Tyrer is unable to work because such an opinion is not a "medical opinion," but, rather, a legal opinion on an issue reserved to the Commissioner. (Doc. #16 at 18 (citing *Soc. Sec. Rul.* 96-5p, 1996 WL 374183, at *2 and 20 C.F.R. §404.1527(e)(3)). Although the authorities cited by the Commissioner discuss the opinions of *treating* physicians, the same principle applies where *consulting* physicians offer opinions on issues reserved to the Commissioner. *See, e.g., Hight v. Comm'r of Soc. Sec.*, 2010 WL 889939, at *7 (W.D. Mich. Mar. 10, 2010); *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004) (consulting physician's opinion on legal issue reserved to Commissioner not entitled to deference). Thus, to the extent Dr. Patel's statement about Tyrer's inability to work is tantamount to an opinion that she is "disabled," the ALJ was not required to credit it.

for its rejection] may not warrant reversal.").  Although the "patently deficient" rule articulated in *Wilson* applies to a treating physician's opinion, it stands to reason that the same is true with respect to the opinions of consultative examiners.  *See Converset v. Astrue*, 2013 WL 646801, at *11 (S.D. Ohio Feb. 21, 2013) ("no reasonable reviewer could place any weight on [the state agency physician's] opinion because it was patently deficient"); *Estate of Mayes ex rel. Executor v. Astrue*, 2011 WL 1897684, at *6 (E.D. Tenn. May 18, 2011) (failure to address consulting physician's opinion may be deemed harmless if it was patently deficient).

In this case, Dr. Patel's opinion that Tyrer is "unable to work" is patently deficient.  Immediately after writing, "…I feel that the claimant would be unable to work," Dr. Patel wrote, "There is no limitation in walking.  There is limitation in carrying, pushing and pulling.  Grip strength is limited.  There is limitation in climbing stairs, climbing ropes, ladders or scaffolding." (Tr. 449).  He also noted that she had no difficulty with sitting.  (*Id.*; Tr. 447).  Thus, a conclusion that Tyrer could perform no work whatsoever is wholly at odds with Dr. Patel's more specific findings about her functional capabilities.

Moreover, in his concurrent medical source statement, Dr. Patel opined that Tyrer can frequently lift and carry up to 10 pounds (up to 20 pounds occasionally), sit for up to six hours per day, and stand/walk for up to two hours per day (Tr. 453-55), all of which is consistent with a finding that Tyrer can perform a reduced range of sedentary work.  *See* 20 C.F.R. §404.1567(a). It is also completely at odds with a finding that Tyrer could perform no work.  In sum, reading Dr. Patel's opinion as a whole, his statement that Tyrer is "unable to work" is patently deficient, as it conflicts with his clinical findings.  The ALJ's failure to discuss this aspect of the opinion is harmless error.[15]

---

[15] Tyrer also appears to challenge Dr. Patel's findings because he purportedly did not receive or

*(2)       Dr. Bleiberg's Opinion*

In June of 2010, Dr. Bleiberg, one of Tyrer's treating physicians, completed a medical source statement, in which he indicated that Tyrer is unable to sit or stand during a workday; can lift up to five pounds frequently; and can never bend, stoop, raise her arms above shoulder level, work around dangerous equipment, or tolerate dust, smoke, or fumes.  (Tr. 444-45).  Tyrer asserts that the ALJ erred in giving only "limited weight" to this opinion.  (Doc. #13 at 20-21).  The court disagrees.

An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (internal quotations omitted).  While treating source opinions are entitled to controlling weight under those circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").  If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the

---

review the records from her January 2010 hospitalization (following her motor vehicle accident). (Doc. #13 at 17).  As the Commissioner correctly points out, however, Dr. Patel is a consultative examiner, whose assessment of Tyrer's functionality was based on his physical examination of her, not solely on a review of her medical records.  (Doc. #16 at 18).  Thus, even if Dr. Patel did not possess and review each and every one of Tyrer's medical records, he could still assess her functional abilities based on his own examination.

opinion with the record as a whole, and any specialization of the treating physician." *Id.* (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion).

Here, the ALJ declined to give Dr. Bleiberg's opinion controlling weight, noting that parts of the opinion "are not well-supported by medically acceptable clinical and laboratory diagnostic techniques." (Tr. 20). For example, the ALJ noted that the doctor's own statement indicated that Tyrer could stand for 15 minutes at a time and sit for 30 minutes at a time at home, which is inconsistent with the total restriction on both activities he imposed during the course of a workday. (*Id.*, citing Tr. 444). Moreover, as the ALJ noted, Tyrer testified that she is able to sit and stand for short periods of time. (Tr. 20, 86). As such, the ALJ reasonably determined that Dr. Bleiberg's opinion is not entitled to controlling weight, and his imposition of a sit/stand at will restriction in her RFC (Tr. 17) is supported by substantial evidence.

After reaching that conclusion, the ALJ went on to determine what weight to give Dr. Bleiberg's opinion, considering the factors set forth in 20 C.F.R. §404.1527(c)(2). (Tr. 20). The ALJ noted that the nature and extent of Tyrer's treatment relationship with Dr. Bleiberg was unclear. (*Id.*). Tyrer testified that she had been treating with Dr. Bleiberg since her January 2010 hospitalization, and the ALJ noted that Dr. Radden addressed notes to Dr. Bleiberg beginning in June of 2010.[16] (*Id.*). However, as the ALJ correctly noted, "no treatment records

---

[16] Tyrer also appears to argue that Dr. Radden's treatment notes provide support for Dr. Bleiberg's opinion. (Doc. #13 at 21). As the Commissioner points out, however, Dr. Radden only submitted one report to Dr. Bleiberg prior to the time that Dr. Bleiberg rendered his June 2010 opinion (Tr. 470-72), and this report does not reflect disabling limitations. For example, Dr. Radden's report indicates that Tyrer could walk normally and bend her back (Tr. 471), which contradicts Dr. Bleiberg's opinion that Tyrer could never bend and was wholly precluded from working (Tr. 444). Dr. Radden also found that Tyrer had a preserved range of motion in her lumbar spine, that her straight leg raising test was negative, and that a neurological examination revealed normal motor, sensory, and reflex findings. (Tr. 471).

24

from Dr. Bleiberg's office are included in the medical evidence record that might substantiate an opinion as to [Tyrer's] ongoing limitations." (*Id.*). This was an appropriate consideration. *See* 20 C.F.R. §404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.). Thus, the ALJ reasonably assigned limited weight to Dr. Bleiberg's opinion regarding Tyrer's functional limitations.

### b. *Tyrer's Mental Impairments*

### (1) *Dr. Kaul's Findings and Opinion*

On June 9, 2009, state agency psychiatrist Dr. Kaul opined that Tyrer is moderately limited in her activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. 340). Specifically, in his RFC assessment, Dr. Kaul opined that Tyrer is not significantly limited in twelve areas and moderately limited in eight areas. (Tr. 314-15). As a result, Dr. Kaul concluded that Tyrer is able to understand, remember and carry out simple instructions and, thus, is "capable of simple repetitive tasks." (Tr. 316). The ALJ gave Dr. Kaul's opinion "substantial weight" because he is familiar with the Social Security disability program, examined the available medical evidence, and issued findings consistent with the manifest weight of the evidence. (Tr. 21).

Tyrer appears to argue that the ALJ erred in giving Dr. Kaul's opinion substantial weight because he "never met claimant," and because he overlooked the difficulty she had in her activities of daily living. (Doc. #13 at 16). With respect to the first point, the fact that Dr. Kaul merely reviewed Tyrer's records, and did not examine her, is not dispositive; the regulations explicitly provide that state agency doctors are "highly qualified" and "experts in Social Security disability evaluation." 20 C.F.R. §404.1527(e)(2)(i). With respect to the second point,

regardless of what Dr. Kaul might have failed to specifically mention in his opinion regarding the difficulties Tyrer allegedly experienced in performing her activities of daily living, the fact remains (and Tyrer concedes) that he concluded she has moderate restrictions in her activities of daily living.  (Doc. #13 at 16; Tr. 340).  Tyrer has failed to explain why either (a) her difficulties result in more than a moderate limitation in this functional area, or (b) a finding that she is moderately limited in this area would support a conclusion that she is disabled or suffers from restrictions greater than those imposed by Dr. Kaul.  As such, Tyrer has not shown that the ALJ erred in giving Dr. Kaul's opinion substantial weight.

### (2)     Mr. Matouk's Consultative Report

The ALJ also considered the clinical findings listed in Mr. Matouk's April 2009 consultative report.  (Tr. 21).  Mr. Matouk noted that Tyrer socialized primarily with her friends and, occasionally, with her boyfriend or family.  (Tr. 309).  A mental status examination revealed full orientation, normal thought content, and slightly tense psychomotor activity.  (Tr. 310).  Mr. Matouk diagnosed Tyrer with major depressive disorder (recurrent, moderate) and ADHD, assigned her a GAF score of 48, and described her prognosis as "fair."  (Tr. 312).  In conclusion, Mr. Matouk opined that Tyrer "would likely be functional for employment with sustained treatment of her AD/HD, alcohol dependence, and depression."  (Tr. 311).

Tyrer challenges the ALJ's reliance on Mr. Matouk's report, asserting that he failed "to state what part [of the report] he agreed with and why and how it supported his Decision."  (Doc. #13 at 19).  Contrary to Tyrer's assertion, however, the ALJ explained that he reasonably discounted Tyrer's GAF score of 48 because he felt that her "longitudinal treatment record" presented a "more complete picture" of her mental functioning.  (Tr. 21).  Courts have recognized that there is no statutory, regulatory, or other authority requiring the ALJ to "put

stock" in a GAF score. *See White v. Comm'r of Soc. Sec.*, 2011 WL 5104622, at *3 (E.D. Mich. Oct. 27, 2011). Indeed, a GAF score of 48 does not necessarily demonstrate disability, and courts have affirmed denials of disability benefits when claimants had GAF scores of 50 or lower. *See DeBoard v. Commissioner of Soc. Sec.*, 211 F. App'x 411, 416 (6ᵗʰ Cir. 2006) (collecting cases). Thus, the ALJ reasonably declined to credit the GAF score he assigned. The ALJ also noted Mr. Matouk's mental status examination and clinical findings, which revealed full orientation, an ability to count forward with serial threes with only slight difficulty, an ability to perform reverse serial twos, and an ability to spell world forward and backward. (Tr. 21, citing Tr. 310-11). In short, the court sees no error in the ALJ's evaluation and use of Mr. Matouk's records.

### (3)   *Dr. Hinchman's Opinion*

Tyrer also argues that the ALJ erred in giving only "limited weight" to the opinion of her treating psychiatrist, Dr. Hinchman. (Doc. #13 at 21-23). Dr. Hinchman completed a medical source statement on June 25, 2010, in which she opined that Tyrer is mildly limited in activities of daily living and social functioning with a GAF score of 55. (Tr. 416-19). Dr. Hinchman further indicated, however, that Tyrer has marked limitations in her ability to work in coordination with or proximity to others without being distracted by them; complete a normal workday or workweek without interruptions from psychological symptoms; and interact appropriately with the general public. (Tr. 419).

As an initial matter, Tyrer appears to broadly assert that treating physician opinions are always deserving of more weight than opinions of state agency doctors. (Doc. #13 at 22). As the Commissioner correctly points out, however, the Sixth Circuit has held that an "ALJ's decision to accord greater weight to state agency physicians over [the plaintiff's] treating sources

27

[is] not, by itself, reversible error." *Blakely*, 581 F.3d at409.  State agency reviewing physicians, such as Dr. Kaul, are independent and unbiased, and their opinions are based on familiarity with the disability program, a review of the entire record at the time of the review, and expertise in determining functional limitations.  *See* 20 C.F.R. §404.1527(e)(2)(i).  Thus, there is no basis to reject Dr. Kaul's opinion simply because it contradicts that of Dr. Hinchman.

Moreover, the ALJ gave good reasons for giving only "limited weight" to Dr. Hinchman's opinion that Tyrer has marked limitations in certain functional areas.  Specifically, the ALJ discounted Dr. Hinchman's opinion in this respect because it was not consistent "with the manifest weight of the medical evidence, which shows that the claimant's mental impairments do not cause negative findings on serial mental status examinations."  (Tr. 22).

Tyrer argues that the ALJ's conclusion in this respect is deficient because, "There is absolutely no indication of what examinations the ALJ is referring to, or who made them." (Doc. #13 at 22-23).  In truth, however, the ALJ's decision contains a thorough discussion of several mental status examinations, conducted by different medical providers, the results of which conflict with Dr. Hinchman's opinion that Tyrer is markedly limited in maintaining concentration or interacting with others.  As noted in the previous section, the ALJ appropriately discussed Mr. Matouk's mental status examination and clinical findings, which are at odds with Dr. Hinchman's opinions.  Moreover, the ALJ noted that, at an April 2009 psychiatric evaluation at CNS (where Dr. Hinchman worked), Tyrer's speech was normal, her memory and fund of information were intact, and she was able to perform simple calculations, indicating at least some ability to concentrate.  (Tr. 21, citing Tr. 422).  The ALJ further noted that at subsequent visits to CNS, Tyrer's mental status examinations were largely normal.  (Tr. 22, citing Tr. 428, 437).  *See also* Tr. 430, 433, 435 (clinical status in late 2009 and early 2010 was "stable" or "improving");

28

Tr. 481 (reporting an improved living situation and that her medications were working in September 2010).  Thus, while Tyrer's treatment records document ongoing mental health complaints and symptoms, they do not support the "marked" limitations that Dr. Hinchman listed.  Finally, the ALJ noted that Tyrer "maintains social relationships with her family and friends," which contradicts Dr. Hinchman's opinion that she is markedly limited in her ability to interact with others.  (Tr. 22).  For all of these reasons, the ALJ's decision to give Dr. Hinchman's opinion only limited weight is supported by substantial evidence.

> 3.    *The ALJ's Credibility Determination is Supported by Substantial Evidence*

Lastly, Tyrer argues – in somewhat cursory fashion – that the ALJ erred in failing to adequately assess the credibility of her subjective complaints.  As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not required to accept a claimant's testimony if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. *Soc. Sec. Rul.* 96-7p, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

In this case, Tyrer asserts that, "The ALJ makes no mention of [her] testimony regarding pain." (Doc. #13 at 23). This is incorrect. In his decision, the ALJ specifically referenced Tyrer's testimony that she needs to lie down two to three times per day due to pain and drowsiness (a side effect of her medication). (Tr. 18). He also noted Tyrer's testimony that her mental impairments cause impaired concentration, mood swings, fatigue, hypersomnia, social withdrawal, inability to follow instructions, and difficulty working with others. (*Id.*). Thus, the ALJ did not ignore Tyrer's testimony; rather, he determined that it was not entirely credible.

In concluding that Tyrer has the residual functional capacity to perform sedentary work, with certain additional limitations, the ALJ considered both Tyrer's subjective complaints and the objective medical evidence. (Tr. 17-23). As discussed more fully above, the ALJ properly weighed the medical evidence, reasonably discounting the opinions of Tyrer's treating physicians and relying on the clinical findings of record, as well as the opinions of Dr. Kaul, Dr. Patel, and Mr. Matouk. In evaluating Tyrer's credibility, the ALJ also noted that her activities of daily living did not demonstrate the type of limitations expected of a disabled individual. (Tr. 22-23). *See* 20 C.F.R. §404.1529(c)(3)(i) (an ALJ may consider a claimant's activities of daily living in evaluating her credibility). For example, the ALJ noted that Tyrer independently performed personal care, prepared simple meals, did household chores, left the house regularly, shopped, and socialized with friends and family.[17] (Tr. 22, citing Tr. 243-46). The ALJ then concluded that, "This broad spectrum of daily activities indicates that the claimant is functioning

---

[17] Tyrer takes issue with the ALJ's reliance on the statements she made in this report, noting that she completed the report prior to both the shooting and the motor vehicle accident. (Doc. #13 at 10). The fact remains, however, that Tyrer alleges a disability onset date of December 31, 2003, about six years prior to those unfortunate events; thus, statements made in the March 2009 Function Report are certainly relevant to a determination of her disability status. As noted, this was but one piece of evidence on which the ALJ relied in reaching his overall conclusion as to Tyrer's credibility. And, other evidence from the late 2009 and early 2010 time period showed improvement in Tyrer's living situation. *See supra* at 28.

at a higher level than generally alleged, and leads to the conclusion that she is only partially credible regarding limitations imposed by her allegedly disabling impairments." (*Id.*).

Thus, the ALJ recognized the duty imposed upon him by the regulations and, in addition to Tyrer's own subjective complaints, he considered the objective medical evidence, as well as Tyrer's daily activities during the relevant time period. (Tr. 17-23). While Tyrer might disagree with the ALJ's credibility assessment, she has failed to articulate a basis for overturning that finding, particularly in light of the great weight and deference an ALJ's credibility finding is due on review. *Kirk,* 667 F.2d at 538; *Smith*, 307 F.3d at 379. Here, where the ALJ gave a reasonable explanation for discounting Tyrer's credibility, and that explanation is supported by substantial evidence, his credibility finding should not be disturbed.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [16] be GRANTED, Tyrer's Motion for Summary Judgment [13] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: May 29, 2013                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*,

638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 29, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager